IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 07 CR 784 |
| v. | ) | |
| | ) | Honorable Charles P. Kocoras |
| DILSHOD UMAROV | ) | |

## NOTICE OF FILING

**To:**   **Lindsay Jenkins**
Assistant U.S. Attorney
219 S. Dearborn, 5th Fl
Chicago, IL 60604

Please take notice that on this 4th day of April, 2008, the undersigned filed the following document(s) in the above captioned cause, a copy of which is attached hereto:

**DEFENDANT UMAROV'S SENTENCING MEMORANDUM
and REQUEST FOR SENTENCE OF TIME CONSIDERED SERVED**

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director

By: _____s/   Helen J. Kim_____

FEDERAL DEFENDER PROGRAM
55 E. Monroe, Suite 2800
Chicago, IL 60603
(312) 621-8344

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 07 CR 784 |
| v. | ) | |
| | ) | Honorable Charles P. Kocoras |
| DILSHOD UMAROV | ) | |

## DEFENDANT UMAROV'S SENTENCING MEMORANDUM

Defendant, DILSHOD UMAROV, by the Federal Defender Program and its attorney,

HELEN J. KIM, hereby submits this Sentencing Memorandum in pursuit of a non-Guidelines

sentence under the authority of *United States v. Booker*, 125 S.Ct. 738 (2005), *Rita v. United

States,* 127 S. Ct. 2456 (2007) and 18 U.S.C. § 3553(a).  Specifically, we respectfully request

that this Court impose a sentence of something less than the recommended Guidelines' sentence

of 10-16 months in prison.  Instead, Mr. Umarov should receive a sentence of time considered

serve (which would be the equivalent of slightly over four months in prison).  We submit that

Mr. Umarov cannot and should not be sentenced according to the advice of the Guidelines —

even at the low-end — because such a sentence would not be fair, just, nor properly considering

all of the factors under § 3553 in this case.  In further support of this sentencing request, we state

the following:

## I.    Who is Dilshod Umarov?

### A.    Introduction

Dilshod Umarov is a Uzbekistan nation who was born on February 7, 1977.  Born to a

1

father who was a general contractor and who owned his own business building houses, his

mother stayed at home, caring for Mr. Umarov and his three older siblings. He is the youngest of

four children, with an oldest sister who is 40; an older brother who is 38; and another sister who

is 34.

Mr. Umarov was fortunate to be born into a family that was able to provide him with

many opportunities. As a boy, he was raised in a huge city and the capitol of Uzbekistan. He

went to school there, and he finished the equivalent of high school, which took a total of ten

years. He also went to college for three years during which he studied economics. Although he

did not end up graduating, Mr. Umarov is still a man inspired by great things, and who is,

genuinely, interesting. He speaks four languages, including Uzbekistan, Russian, Turkish, and

English. He grew up playing sports, enjoying everything from swimming, karate and piano

lessons, which he took for five years. As the youngest of his siblings, he says he had a happy

childhood and young adulthood. Yet he yearned for greater things. That is what inspired him to

come, legally, to the U.S.A. in 1999.

### B.    Dilshod Umarov's Entry to the United States.

As Mr. Umarov described to his defense counsel, when being interviewed for purposes of

this Sentencing Memorandum, he came to the United States at the age of 22, in 1999, with hopes

and dreams of having more opportunity for everything. His first goal was to further his

education. He simply wanted to learn and "achieve more in life" than he could at home. He

originally entered the country using his Uzbekistan-issued passport and with permission through

a student visa. *See* Plea at 3. Once here, however, he found it to be quite different from what he

thought it would be. The first and most notable difference was the little to no sense of

community he felt here.

Specifically, Mr. Umarov found it very difficult to start his life here without the friendliness of people around him that knew him; instead, he found many people in the U.S. unfriendly, and culturally different than he. Over time, however, Mr. Umarov did begin to grow a small group of friends. He went out and met, through friends of friends or acquaintances, other people who were familiar with the city he grew up in. He mostly found friends who spoke Russian, a commonality that ended up to go a long way with him in helping him to find his place in the U.S. He took English classes to gain better proficiency in the English language. He worked in construction, building houses on projects that would keep him busy for months at a time, then leave him with nothing to do for months following. Then, he met Ekatarina Tseburskaya, originally from Ukraine but a U.S. citizen who came to the U.S. with her own parents and family, four years ago, after being introduced through a friend.

At the time, Ekatarina was living with her parents in Wheeling, Illinois, and working at a beauty salon, full-time. Mr. Umarov was employed, at that time, as a taxi driver for a company that allowed him to earn enough money to pay rent and for his necessary items. Although his job left him feeling under challenged and yearning for more out of life, he eventually stopped driving a taxi just after one year — due to the notorious September 11th attack that left business considerably slowed at the airports he was servicing. He resorted, once again, back to his construction skills and talents, working at a company in Buffalo Grove named Kur and Kos for the next several years.

Meanwhile, Mr. Umarov and Ekatarina fell in love. They moved in together a year later, and last year, they officially wed in City Hall. They immediately began planning to have their

own family, and soon enough, Mr. Umarov and Ekatarina found out they were pregnant with their first child. They were both very happy. Both want to have two children. Both are parents for the first time, yet arrested on December 3, 2007, Mr. Umarov spent four of the most precious months of his life in prison. During this time, Ekatarina gave birth to their first child, Kamila, on March 19, 2008.

### C.    Mr. Umarov's Current and Future Life

Living in Arlington Heights, in a two bedroom condominium which Ekatarina purchased with help from her parents, they have been making payments towards their monthly mortgage of $1050. They have been living five minutes away from Ekatarina's parents, which allowed them to visit on a daily basis. This was always Ekatarina's desire: To be close to her parents. Meanwhile, Mr. Umarov was very happy. He was able to speak to his own parents by phone, usually twice weekly.

Now in their 60s, his mother's health is good but his father's has worsened lately, due to high blood pressure and age, generally. This was the reason that Mr. Umarov engaged in his criminal act of fraudulently applying for a U.S. passport. He had not seen his family for seven years, but he wanted to go home to see his father who was sick. He told this to Immigration Officer Johathan Cichy when he was interviewed at Chicago O'Hare Airport on December 1, 2007. He also told the Officer that he wanted to talk to his wife, who is pregnant; his biggest concerns were apparent as he asked the following questions that were documented by Officer Cichy in discovery documents given to the defense: "What will happen to me, will I be deported, will I see an Immigration Judge? My wife is pregnant, can I stay here? Can I talk to my wife?"

Four months later, now, at the present time, Mr. Umarov is very aware of the fact that his

life in the U.S. is over.  He is aware that the next chapter in his life will begin with his release

from prison, here, at which time he will return to Uzbekistan, and he will be back with his family

there.  He holds high hopes for the life he will be able to have in the city of Tashkent after he is

released from prison.  They now plan to live somewhere close to Mr. Umarov's parents in

Uzbekistan when Mr. Umarov is released.

Unfortunately, however, the impending move makes Ekatarina sad and unhappy.  It

means she will be far from her own family, but as Mr. Umarov stated, "We have little choice.

No choice."  Just as Mr. Umarov is fully aware of the fact that he cannot stay in the U.S.,

Ekatarina's separation from her family must follow.  Both are fully aware of the meaningful

impact this will have — not just for them, but also their new daughter.  She will no longer have

the future they had hoped for her.  Although at one time in the past, Mr. Umarov questioned his

desire to stay in the U.S. indefinitely, after meeting and marrying Ekatarina, he would have

stayed.  It would have been for her sake and the future of their kids.

Now, when asked about going back to Uzbekistan, Mr. Umarov says, "I don't know what

is in store for our future, but I will try my best."  When asked to describe what he thinks will be

the deprivation felt by their new child, Kamilla, he simply said, "Everything."  Mr. Umarov has

been lucky to be placed at the Metropolitan Correctional Center in Chicago since his initial

appearance on December 3, 2007, as he has been allowed daily phone calls with Ekatarina.  She

has been able to visit with him weekly, on Tuesdays, and every other weekend.  She has been

well aware of his true love and concern for her despite his inability to be physically present

during the most important months of her pregnancy.  Notably, however, Mr. Umarov was

deprived of his right to be present when she was giving birth at the hospital.  Those moments will

never be returned to him or her, despite the fact that they love each other.

## II.    U.S.S.G. Calculations

Mr. Umarov has pled guilty to committing the crime of Title 18 U.S.C. § 1542.

Specifically, he admitted that he knowingly and willfully made a false statement in an application

for a passport with the intent to secure the passport for his own use; he falsely represented in his

application that he was a U.S. citizen born in Roseville, Michigan, with parents in the U.S. when,

in fact, that was not true in 2006.  Accordingly, Mr. Umarov will need to be sentenced and

punished for his crime.

The parties have no disagreement with the calculations proposed in the Plea Agreement.

Specifically, the parties agree that under U.S.S.G. § 2L2.2, the base offense level is 8.  *See* Plea

at 5.  Under (b)(3)(A) of that section, a 4 level increase would likely apply as a U.S. passport was

fraudulently obtained or used.  *See* Plea at 5; *see also* U.S.S.G. § 2L2.2(b)(3) (2007).  Moreover,

the parties agree that under § 3E1.1(a), Mr. Umarov would qualify for a 2 level decrease,

bringing his adjusted offense level to 10.  *See* Plea at 6.

As for his criminal history, the parties again agree that Mr. Umarov's likely criminal

history category is III as he has 3 criminal history points.  *See* Plea at 5-6; *see also* U.S. Version

at 5, fn. 2.  Accordingly, his sentencing range is 10-16 months.  *See* Plea at 6; U.S. Sentencing

Memorandum at 3.  We do not agree with the government, however, that Mr. Umarov should

receive a sentencing within the advisory range of the Guidelines.  *See* U.S. Sentencing

Memorandum at 3-5.  We believe that he should receive something less.

**III.    What is An Appropriate Sentence Under Section 3553?**

**A.    *Booker* and 18 U.S.C. § 3553**

Specifically, we now submit that a sentence of time considered served, or at most five months, would better reach the sentencing goals under 18 U.S.C. § 3553 than any Guidelines-range sentence could in this case.  The primary directive in 18 U.S.C. § 3553(a) is that the Court impose a sentence "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing.  *See* 18 U.S.C. § 3553(a) (emphasis added).  Those purposes are listed to include the following goals:

- to reflect the seriousness of the offense, promote respect for the law, and provide just punishment
- create adequate deterrence
- protect the public from future crimes of the defendant; and
- to provide the defendant with necessary treatment and training.

18 U.S.C. § 3553(a)(2).

Additionally, however, Section 3553(a) lists additional factors for the Court's consideration.  These include consideration of the following:

- the nature and circumstances of the offense ((a)(1))
- the history and characteristics of the defendant ((a)(1))
- the kinds of sentences available ((a)(3))
- the sentencing guideline range ((a)(4))
- pertinent Sentencing Commission policy statements ((a)(5)) and
- the need to avoid unwarranted sentencing disparities ((a)(6))

18 U.S.C. § 3553.  *Booker*'s primary directive is one that reads: "Without the 'mandatory' provisions, the [Sentencing Reform] Act . . . requires judges to take account of the guidelines together with other sentencing goals."  *United States v. Booker*, 543 U.S. 220, 259 (2005).

As *Booker* explains: "Section 3553(a) remains in effect, and sets forth *numerous factors*

that guide sentencing." *Booker*, 125 S.Ct. at 766 (emphasis added).  More specifically, § 3553(a)

directs sentencing judges to impose a sentence "sufficient, but not greater than necessary, to

comply with" the broad sentencing goals set forth in 18 U.S.C. § 3553(a)(2).  Importantly, the

statute, after the excision of § 3553(b)(1), provides no indication that any one of these factors

deserves more or less consideration or weight than any other. Instead, section 3553(a) lists seven

factors that a sentencing court "shall consider" at sentencing, and one of those — subsection

(a)(4) — is the guidelines.

Booker also directed that the guidelines still be "consulted" and taken into "account," but

it provides no basis for concluding that any one factor deserves more weight than any other.

*Booker*, 125 S.Ct. at 764.  *Booker* excised § 3553(b)(1), the only provision of the Act that

elevates subsection (a)(4) above all others, because it violated the Constitution.  The only

conclusion to be drawn from this is that subsection (a)(4) survives only to the extent it rests on

equal footing with the other factors in § 3553(a).

**B.**    **Mr. Umarov's Advisory Range Under the Guidelines Overrepresents the Seriousness of his Crimes or his True Likelihood of Recidivism as He Will Be In Uzbekistan After he Completes his Sentence.**

Under U.S.S.G. § 4A1.3, it is clear that the Sentencing Commission intended the Court to

openly consider the idea that a person's criminal history category may over-represent the true

seriousness of that person's criminal history or likelihood of recidivism.  U.S.S.G. § 4A1.3

(2007).  In Section (b)(1) of 4A1.3, the concept of a "downward departure," in pre-*Booker* terms,

discusses a *warranted* departure from the Guidelines range for those cases where "a defendant's

criminal history category substantially over-represents the seriousness of the defendant's criminal

history or the likelihood that the defendant will commit other crimes . . . ."  *See* U.S.S.G. §

8

4A1.3(b)(1) (2007).

In Section 4A1.3, it states:

If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

U.S.S.G. § 4A1.3(b)(1) (2007).  The application note to that section further states:

A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period. A departure below the lower limit of the applicable guideline range for Criminal History Category I is prohibited under subsection (b)(2)(B), due to the fact that the lower limit of the guideline range for Criminal History Category I is set for a first offender with the lowest risk of recidivism.

U.S.S.G. § 4A1.3, n.3.

As this court is aware, the federal sentencing statutes require all district courts impose the least restrictive sentence in order to comply with the goals of federal sentencing.  *See* Title 18 U.S.C. §3553(a).  The Commission's purpose in writing the Criminal History and Criminal Liveihood Chapter started with the premise that a defendant "with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence.  To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered.  Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation."  *See* U.S.S.G. § 4A1.1, intro commentary.  Yet the commission notes, "The Commission has made no definitive judgment as to the reliability of

the existing data." *Id.*

In this particular case, there is reliable information for this Court to know and find that despite having a criminal history category of III, Mr. Umarov's advisory range of 10-16 months does not accurately reflect his true likelihood of recivism. There is no link between his prior crimes and the sentence he is receiving now. Chapter Four, which was meant to address and ensure that certain repeat offenders receive a sentence of imprisonment that reflects their likelihood of recidivism or ability to be rehabilitated does not correlate with Mr. Umarov's circumstances or case. He will not be here after his sentence is complete. He will not recidivate because he will be tending to his family in Uzbekistan. There is nothing in his history to reveal him to be a man other than one who wants to be with his family again.

As stated earlier, Mr. Umarov initially entered the country in 1999 on a student visa, yet the crime for which he is being sentenced now is one that he committed in 2006. At the time, he had been in the country illegally for six years. By that time, he had met and moved in with his now wife, Ekatarina. He was working, and they planned to remain here, yet he had not seen his family for a term of seven years. As he told the Court truthfully at the time of his plea, he bought a false birth certificate for $500, then used this fake birth certificate to obtain a U.S. passport, which he received within 2 days of his application. The impetus for his crime was to see his ailing father, Yet the result of his crime is precious time lost with his wife during her most important months of pregnancy and the birth of his child.

Importantly, Mr. Umarov's passport has been revoked and he has already withdrawn his admission from the U.S. after he was detained by the FBI and Immigration Customs & Enforcement. He has already retained an immigration attorney in order to expedite his removal

10

from the United States after his sentence is completed.  *See* Exhibit A, Letter from Justin Burton,

Attorney with Kriezelman Buron & Associates.  Moreover, as Mr. Burton writes in his letter to

the Court, as Mr. Umarov has not sought permission to stay, he will be immediately transported

to the airport for his removal from the United States when he is released from prison.  *See*

Exhibit B, Letter to the Court from Justin Burton.

###    C.    No Goals of § 3553 Will be Better Met By a Six to Ten Month Sentence Than a Sentence of Four to Five Months.

We submit that an important question for this Court is what goals, if any, of 3553 would

be better met with a sentence of 10-16 months than would be achieved by a 4-5 month sentence

could not?  The answer is none.

Four to five months would accurately reflect the seriousness of the offense, promote

respect for the law, and provide just punishment.  This is especially true given the fact that there

is a political context for this prosecution.

Four to five months would sufficiently meet the purpose of deterrence, as Mr. Umarov

will certainly not be coming back nor would any person who hears about his plight be incited to

try falsely applying for a passport either.  Mr. Umarov's particular circumstances and the place he

was in his life cannot be excused but it cannot be ignored either.  The requested sentence meets,

sufficiently, the goal of creating "*adequate* deterrence." See 18 U.S.C. § 3553(a) (Emphasis

added.)

Moreover, as already stated, there is no need to protect the public from future crimes of

Mr. Umarov — he will not be present in the U.S. when he is done with his sentence.  Yet at the

same time, a sentence any longer than the one we are proposing does nothing for necessary

treatment and training — a distinct and fourth consideration under § 3553.

Consider, too, the fact that the monthly cost of incarceration, according to U.S. Probation reports for other cases, is $2,036.92. Any argument that the sentence should be in the Guideline range simply because it is what the Guidelines says it should be or because anything less would automatically result in disparity completely misses the point of the Supreme Court has said. In *Booker*, *Rita* and *Gall*, each time, the Supreme Court reiterated how the Guidelines are *not* the benchmark, afterall, by which sentencing courts are to base their judgments and sentences. Instead, this Court can use its better judgment to devise a sentence more carefully matching and analyzing the § 3553 factors.

## IV.    Conclusion

We submit that the appropriate sentence for Mr. Umarov that is sufficient but not greater than necessary would be one that includes something *other* than the recommended term of prison. A *sufficiently* punitive sentence is what § 3553 requires.

The time Mr. Umarov has spent in custody at the M.C.C. in Chicago has been difficult, both emotionally and physically. It has caused much angst and grief to him, his wife, his parents, her parents, and frankly, the whole community which is aware of Mr. Umarov's predicament and his inability to be with his wife during her pregnancy. The fact that Mr. Umarov will be removed from the U.S. when his ordeal is done and over with only means that his wife and their baby must put their lives on hold, literally, as they wait for Mr. Umarov to be sentenced. They are unaware of how much longer they will have to prepare for their move to Uzbekistan. They are anxious to know the exact date they will go, where they will go, where they will live, and what life will be

like for them after they move.  No sentence of imprisonment can alleviate these anxieties.  The best justice that can be done, given the circumstances of this case, is to allow this family to move on with their lives, and allow Mr. Umarov the chance to join his wife and their new baby in Uzbekistan.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director

By: s/ Helen J. Kim

FEDERAL DEFENDER PROGRAM
55 E. Monroe, Suite 2800
Chicago, Illinois 60603
(312) 621-8344

## CERTIFICATE OF SERVICE

The undersigned,  Helen J. Kim , an attorney with the Federal Defender Program, hereby

certifies that in accordance with FED.R.CIV.P5, LR5.5, and the General Order on Electronic

Case Filing (ECF), the following document(s):


**DEFENDANT UMAROV'S SENTENCING MEMORANDUM**


was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by

first-class mail/hand delivery on   April 4, 2008  , to counsel/parties that are non-ECF filers,

including:




By:       s/ Helen J. Kim


FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, Illinois 60603
(312) 621-8344

# IN THE
## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                Plaintiff,    )
                           )
       v.               )    No. 07 CR 784
                           )    Hon. Charles P. Kocoras
Dilshod Umarov,          )
                Defendant.    )

## EXHIBITS TO MOTION TO REDUCE SENTENCE

EXHIBIT A    Letter from Justin Burton

EXHIBIT B    Letter to Court From Justin Burton

# EXHIBIT A

# Letter from Justin Burton

# KRIEZELMAN BURTON & ASSOCIATES, LLC
### ATTORNEYS AND COUNSELORS AT LAW
20 NORTH CLARK STREET
SUITE 725
CHICAGO, ILLINOIS 60602

(312) 332-2550
FAX # (312) 782-0158

March 10, 2008

JEFFREY A. KRIEZELMAN
JUSTIN R. BURTON
SAADIA SIDDIQUE
ERIN C. COBB

Mr. Helen Kim, Esq.
Office of the Federal Defender
55 East Monroe Street – Suite 2800
Chicago, Illinois  60603

Re:  UMAROV, Dilshod

Dear Attorney Kim:

As you know, our offices were just recently retained for purposes of Mr. Dilshod Umarov's immigration status in the United States.

We spoke at some length with you relating to Mr. Umarov's case.  At that time, you did indicate that your offices intended to change Mr.  Umarov's plea so that he may immediately begin his sentence under an agreement with the U.S. Attorneys' office.  You did indicate that your belief was that Mr. Umarov would suffer between ten and sixteen months of incarceration.  At that time, you were unsure as to how you wished to use our offices for purposes of Mr. Umarov's immigration status.

We you are aware, we stand ready to either be available as an "expert witness" or an advocate relating to Mr. Umarov's case.  Should you require our offices to appear as an "expert witness" at a sentencing proceeding, please do not hesitate to contact us immediately.  We remain ready to assist in this capacity.

Nevertheless, Mr. & Mrs. Umarov have requested that our offices be involved in expediting his removal from the United States after his sentence is completed.  It is our understanding that Mr. Umarov withdrew his admission to the United States after he was detained by the FBI and Immigration Customs & Enforcement.  This would provide him with an opportunity of simply departing the United States on the same carrier that provide him with transport to the United States.  He would not be entitled to appear before the Immigration Court in removal proceedings.  This would, of course, delay his departure from the United States greatly.

We do remain ready and able to assist should your offices wish to call upon us.  We do speak at national conferences and presently hold the position of Secretary of the Executive Board of the Immigration Lawyers Association in Chicago.

Very truly yours,

JUSTIN R. BURTON

JRB:ck

# EXHIBIT B

## Letter to Court From Justin Burton

# KRIEZELMAN BURTON & ASSOCIATES, LLC

### ATTORNEYS AND COUNSELORS AT LAW
### 20 NORTH CLARK STREET
### SUITE 725
### CHICAGO, ILLINOIS 60602

### (312) 332-2550
### FAX # (312) 782-0158

**JEFFREY A. KRIEZELMAN**
**JUSTIN R. BURTON**
**SAADIA SIDDIQUE**
**ERIN C. COBB**

March 25, 2008

Honorable Charles P. Kocoras
U.S. District Court – Eastern Division
Northern District of Illinois
219 South Dearborn Street – Suite 1725
Chicago, Illinois  60604

Re:  United States v. Dilshod Umarov
Case NO. 07 CR 784

Dear Judge Kocoras:

Our offices have been retained by Mr. Dilshod Umarov, Defendant, in the matter of the United States of America v. Dilshod Umarov, Case No. 07 CR 784, for purposes of his immigration related status in the United States.

Mr. Umarov is a citizen and national of Uzbekistan.  On or about November 8, 1999, Mr. Umarov was issued an F-1 nonimmigrant student visa to enter the United States for purposes of studying at the San Francisco Institute of English.  On or about November 26, 1999, Mr. Umarov was admitted into the United States on the subject nonimmigrant visa.  He was provided an opportunity to remain in the United States for a short duration of time.  It appears that Mr. Umarov never attended classes at that institution.  He then remained in the United States continuously until 2007 when he left the United States for abroad.

It further appears that Mr. Umarov obtained a birth certificate noting that he was born in the United States.  He then used the subject birth certificate for purposes of procuring a U.S. Passport.  After obtaining the subject passport based on the misrepresentation that he was and is a U.S. citizen, he traveled overseas.  On January 28, 2007, he presented the subject U.S. Passport at O'Hare International Airport and again indicated that he was a U.S. citizen.  On October 2, 2007, he returned to the United States using the U.S. Passport.  He was thereafter detained by the Immigration Customs & Enforcement branch relating to false misrepresentation in obtaining the U.S. Passport.

Mr. Umarov has initially indicated that he does not fear his return to Uzbekistan.  This is important in that there remain no grounds for his seeking asylum, withholding of removal or "convention against torture" relief while remaining in the United States.  If an alien enters the United States, he has the right to seek the subject relief.  The subject relief is only available upon a showing that he reasonably or credibly fears a return to his home country.  In Mr. Umarov's case, he has indicated that he does not fear returning to his home country and has withdrawn his admission to the United States.

A withdrawal of a request for admission to the United States prohibits an individual from seeking benefits under the Immigration Act.  Further, he would be placed on the same company's aircraft carriers for the purpose of return to the country of origin.  In this instance, Mr. Umarov's withdrawal of his request for admission to the United States, even using his U.S. Passport, is tantamount to waiving all rights to various applications to remain in the United States.  Even if Mr. Umarov was provided an opportunity of seeking forms of relief in the United States, he would be unable to do so.  "Cancellation of removal" which is available to non-permanent residents of the United States requires that the individual remain in the United

States for a continuous period of not less than ten (10) years, be a person of good moral character and have a qualifying U.S. citizen or lawful permanent resident immediate relative. In Mr. Umarov's case, it is doubtful that he may show that he is a person of good moral character.

One who has given false testimony for purposes of obtaining any benefit under the Immigration Act is prohibited from establishing good moral character. 8 U.S.C. Section 1101. Moreover, Mr. Umarov has not remained in the United States for a continuous period of more than ten (10) years. In fact, his tenth year is due to expire in November of 2009. Only then would he be able to establish his ten (10) years of continuous residence in the United States. We must note that the ten (10) year period of continuous residence ceases upon issuance of the "Notice to Appear" charging the individual with removability from the United States. Thus, we do not believe Mr. Umarov can establish prima facie eligibility for cancellation of removal pursuant to 8 U.S.C. Section 1229(b).

Mr. Umarov is presently subject to his own withdrawal of admission to the United States. Upon release from criminal custody, we believe that he shall be immediately transported to the airport for removal from the United States. It is further our understanding that since he withdrew his admission from the United States and has not been removed herefrom, the U.S. government does not need to seek permission from his home country for his removal from the United States.

We do remain ready and able to answer any questions should Your Honor require our appearance in your court.

Very truly yours,

JUSTIN R. BURTON

JRB:ck